CLERK'S OFFICE
A TRUE COPY
Aug 21, 2020
s/ Daryl Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched or identify the person by name and address)* )<br> )<br>Social media account – that is, "A-Naman" – which is )<br>stored at premises controlled by Snap Inc. (Snapchat) ) | Case No.    20    MJ    189 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §922(a)(1)(A); 26 | Engaging in a firearms business without a license |
| U.S.C. § 5861(b); 26 U.S.C. § | Receipt or possession of firearm transferred in Violation of the NFA |
| 5861(f) and 18 U.S.C. § 371 | Making a Firearm and Conspiracy |

The application is based on these facts:

See attached affidavit for additional offense descriptions.

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days* _____ *)* is requested under 18 USC § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

ATF SA Ryan Arnold
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date:  August 21, 2020

_____
*Judge's signature*

City and state:  Milwaukee, WI

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Ryan Arnold, being first duly sworn, hereby depose and state as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.       I make this affidavit in support of an application for a search warrant for information which is associated with one social media account – that is, "A-Naman" – which is stored at premises controlled by Snap Inc. (Snapchat), an electronic communications services provider and/or remote computing services provider which accepts service of process at 63 Market Street, Venice, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A), and 3512(a), to require Snapchat to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.       I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since April 2015. As an ATF Special Agent, I have participated in numerous investigations regarding the unlawful possession of firearms by convicted felons. I have also conducted investigations related to the unlawful use of firearms, firearms trafficking, drug trafficking, and arson.

3.       Prior to my employment with ATF, I was a Special Agent with the United States Secret Service (USSS) for nearly 5 years. My duties included providing and planning dignitary protection, drafting and executing Federal search warrants, investigations of organized crime

networks, investigations of threats against USSS protectees, fraud networks, counterfeit currency investigations, and other financial crime investigations.

4.    Previous to my tenure with the USSS, I served as a police officer with the Chicago, Illinois, Police Department (CPD).  During part of my career as a CPD Officer, I was assigned to the Organized Crime Division-Gang Enforcement Unit.    My responsibilities included the investigations of street gangs, narcotics distribution, firearms violations, robbery, home invasions, operating in an undercover capacity, and the authoring and execution of search warrants.

5.    I have received training in the investigation of firearm and drug trafficking. Based on my training, experience, and participation in firearm trafficking investigations, I know and/or have observed the following:

a.  I have utilized informants to investigate firearm and drug trafficking.  Through informant interviews and debriefings of individuals involved in those offenses, I have learned about the manner in which individuals and organizations distribute these items in Wisconsin and elsewhere;

b.  I have also relied on informants to obtain firearms (as opposed to licensed gun dealers) and controlled substances from individuals on the streets, known as a controlled purchase;

c.  I have experience conducting street surveillance of individuals engaged in firearm and drug trafficking.  I have participated in the execution of numerous search warrants where drugs, firearms, ammunition, and magazines have been seized;

d.  I am familiar with the language utilized over the telephone to discuss firearm and drug trafficking, and know that the language is often limited, guarded, and coded;

e. I know that firearm and drug traffickers often use electronic equipment to conduct these operations;

f. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

g. I know that firearm and drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate these and related offenses; and

h. I know that firearm and drug traffickers often use proceeds to purchase assets such as vehicles, property, jewelry, and narcotics. I also know that firearm and drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials I also know what firearm and drug traffickers may keep photographs of these items on electronic devices.

6. I have participated in multiple firearm and drug trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices. In many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

7. This affidavit is based upon my personal knowledge, my training and experience, and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit

is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C § 922(a)(1)(A) (engaging in a firearms business without a license), 26 U.S.C. § 5861(b) (Receipt or Possession of Firearm Transferred in Violation of the NFA), 26 U.S.C. § 5861(d) (Possession of Unregistered NFA), 26 U.S.C. § 5861(e) (Transferring Firearm in Violation of NFA), 26 U.S.C. § 5861(f) (Making Firearm in Violation of NFA), 26 U.S.C. § 5861(i) (Possession of NFA without a Serial Number),   and 18 U.S.C. § 371 (conspiracy). There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

9.      The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9.      On June 09, 2020, ATF confidential informants (CI) 28829 and 28830 stated they were aware of an individual named "Noma" who was selling firearms and silencers. CI 28829 advised "Noma" could obtain multiple silencers and fully automatic weapons. "Noma" was identified by the CIs via Wisconsin Driver's License photograph as Noman AFZAL (W/M, DOB: 09/06/2001).   According to the CIs, AFZAL claimed he had an associate that could obtain these items.

10. For several reasons, case agents believe that the CIs are reliable and credible. First, the CIs have been provided information that was corroborated by the recovery of physical evidence. For instance, with the assistance of a video provided by the CIs of AZAL firing the pistol with the suspected silencer, the CIs were able to direct agents to the location where this incident occurred. This information was corroborated when an ATF canine search located expended 9mm shell casings (incident outlined below). The CIs do not have any outstanding charges or cases pending. The CIs have expressed their concern for public safety and expressed their desire to remove these items and the individual(s) responsible for manufacturing them (silencers and fully automatic firearms). Third, the CIs are also receiving financial compensation for their information. The CIs know that if their information is not accurate or fabricated they will not receive compensation. CI 28829 has one 2014 misdemeanor disorderly conduct conviction and one 2019 retail theft conviction. CI 28830 has one 2012 misdemeanor retail theft conviction.

11. During this investigation we have conducted multiple "controlled buys." Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant purchases drugs, firearms or other items from a target. The operation is conducted using surveillance, usually audio and video recording equipment and pre-recorded purchase money provided by law enforcement. When a confidential informant is used, s/he is searched for contraband, weapons, and money before the operation. The informant is wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined location and gives the agents the purchased drugs, firearms or other purchased items and the recording/monitoring equipment. The informant is again searched for contraband, weapons, and money and then is interviewed by the case agents about the transaction. If the informant purchased drugs, a sample of the suspected drugs is field tested by the

case agents for the presence of controlled substances and then placed in inventory. Ideally, all of the calls to the target by the informants are consensually recorded calls under the direction and control of case agents and made in the presence or by direction of case agents. Additionally, case agents typically observe the informants dial the target's number on each occasion. On occasion, it is not feasible or safe to record and monitor an informant's telephone call made to a target. Typically, these unrecorded calls are unforeseen adjustments or very short calls to indicate arrival, departure or other less significant issues. Unless otherwise noted, the controlled buys and telephone contacts summarized below were conducted pursuant to the above procedures. The controlled buys conducted with Noman AFZAL are outlined below. Investigators, when possible, independently corroborated information provided by the CIs. Whenever possible telephone calls between the CIs and AFZAL were monitored. All meetings for controlled purchases between the CI and AFZAL were monitored, recorded, and documented by agents.

12.    CI 28829 provided ATF with a video from on or about June 3, 2020, that depicted AFZAL firing a handgun with a suspected silencer affixed to the barrel. AFZAL fired approximately six (6) shots near 1521 West Bruce Street, Milwaukee, Wisconsin, during daylight hours. The sound of the firearm discharging on the video was not as loud as a typical gunshot. Affiant believes the device screwed to the end of the barrel was softening the noise, and therefore, a suspected silencer. This CI also advised that AFZAL fired the same firearm with silencer at 2625 South Greeley Street, Milwaukee, Wisconsin.

13.    On June 10, 2020, ATF agents traveled to both locations, 1521 West Bruce Street and 2625 South Greeley Street, in order to locate expended shell casings. At the Greeley location, agents searched for the casings but found the area on a slope covered with grass. At the Bruce location, the area was covered in grass and underbrush. Agents contacted ATF Explosives

Detection Canine (EDC) Handler Jason Salerno who has a dog (Sandi) that is trained in explosives detection. This means that Sandi can find expended shell casing fired from a firearm through scent.

14.    On June 11, 2020, SA Salerno and Sandi located two (2) PMC 9mm Luger ammunition casings in the grass at 2625 South Greeley Street. These casings were recovered by SA Salerno. At 1521 West Bruce Street, Sandi located one (1) PMC 9mm Luger ammunition casing on the lip of the sidewalk. This casing was recovered by SA Salerno.

15.    On June 11, 2020, CI 28829 and 28830 met ATF agents and conducted a telephone call to AFZAL's cellular phone at 414-539-8733 (AT&T listed as carrier). The CIs made final arrangements with AFZAL to purchase the suspected silencer for $1,600.00. The CIs and their vehicle were searched prior to the beginning of the operation. No contraband was located.

16.    On June 11, 2020, The CIs were instructed by AFZAL to travel to Wilson Park located at 1601 West Howard Avenue, Milwaukee, Wisconsin, 53221. AFZAL arrived in a silver, Hyundai Sonata bearing Wisconsin license plate AHJ-6759 and parked near the CIs. The registration plate listed to a 2017 Grey Subaru Legacy registered to AFZAL. AFZAL entered the CIs' vehicle and sat in the middle, rear passenger seat. The CIs and AFZAL engaged in negotiations. The CIs provided $1,600.00 (ATF funds) to AFZAL and AFZAL provided the suspected silencer to the CIs, all of which was video/audio recorded. AFZAL exited the CIs' vehicle, returned to his Hyundai Sonata, and then departed the area. The CIs immediately met agents after the deal and transferred the silencer into ATF possession (pictured below). The CIs and vehicle were searched for additional contraband and no contraband was located.



17.     Following the above-described transaction, the CIs informed the agents that AFZAL had called them regarding a proposed purchase of two (2) additional silencers. According to AFZAL, these silencers were constructed differently than the silencer purchased on June 11, 2020 and therefore, AFZAL proposed a reduced sale price. At the direction of ATF, the CIs initiated negotiations with AFZAL. The CIs and AFZAL agreed to meet on June 16, 2020. During their conversation, AFZAL referenced an individual who was manufacturing the silencers that AFZAL was selling to the CIs. AFZAL informed the CIs that this firearm supplier could make a fully automatic, AR-15 chambered in 300 "Black Out" ammunition. AFZAL told the CIs that he would be able to sell this firearm to them. AFZAL further advised the CIs that this firearm supplier lived on the north side of Milwaukee.

18.     On June 16, 2020, and in the presence of agents, the CIs called AFZAL on his cellular phone number at 414-539-8733. AFZAL and the CIs finalized the meeting location for the proposed purchase of two (2) silencers. The CIs were instructed by AFZAL to travel to "Gordie Boucher Nissan of Greenfield" located at 4141 South 108th Street, Greenfield, Wisconsin, 53228.

19.     On June 16, 2020, the CIs arrived at 4141 South 108th Street, Greenfield, Wisconsin, 53228 and found AFZAL in the same silver, Hyundai Sonata bearing license plate AHJ-6759. AFZAL was in the company of Klaudio PROKO (W/M, DOB: 09/06/2000).  PROKO remained at the Nissan dealership while AFZAL entered the back seat of the CIs' vehicle.  The CIs were asked by AFZAL to change locations to the Crawford Animal Hospital parking lot located at 4607 South 108th Street, Greenfield, Wisconsin, 53228.  Affiant knows that changing locations is common tactic used by criminals who prefer to conduct counter- surveillance prior to consummating a deal for contraband.  Once at the new location, AFZAL advised the CIs he had three (3) silencers and showed these silencers to the CIs.  Three (3) silencers was more than what was agreed upon during their phone negotiations for two (2) silencers.  However, the CIs agreed to AFZAL's offer and purchased all three silencers for $1,800.00 (ATF funds).  Also during the transaction, AFZAL told the CIs he could get a fully automatic AR-15, chambered in 300 "Black Out" ammunition, with a silencer for approximately $2,500.00.   The proposed fully automatic AR-15 transaction would take place at a later date and time.  After completing the transaction for silencers, which was video/audio recorded, AFZAL returned to his vehicle located in the Nissan dealership parking lot.  The CIs departed the parking lot, then met the agents at a predetermined location and provided the three silencers (pictured below).  Agents searched the vehicle and CIs and located no additional contraband.





(internal components of silencers)

20.     ATF Special Agent Gregory Stimmel of the Firearms Technology Branch (FTB)

observed photographs of the above silencers and provided verbal confirmation that these indeed

are silencers.  As a result of the determination, these items are regulated by the National Firearms

Act (NFA).

21.     On June 16, 2020 and after the sale of the three (3) silencers, AFZAL contacted CI 28830 via Snapchat utilizing username "A-Naman."  During their conversation, AFZAL provided a photograph of the fully automatic AR-15 discussed during the silencer transaction (pictured below).  Affiant knows that Snapchat is a social media messaging application that can be used via cellular phone.



22.     On July 12, 2020, CI 28830 received a photograph of a firearm that appeared consistent with a Walther, model PPQ, .22 caliber pistol with threaded barrel capable to receive a silencer.  In addition, an object consistent with a silencer was visible.  The photo was sent from AFZAL's Snapchat account: "A-Naman".   The following is a screenshot provided by the CI from AFZAL:



25.     On July 15, 2020, CI 28830 and AFZAL agreed to meet for AFZAL to provide

the CI a firearm with a silencer in exchange for US Currency.  ATF SA Michael Ramos (acting

in an undercover capacity) drove the CI to complete the transaction.  CI 28830 and SA Ramos

traveled to the agreed upon transaction location at 1601 West Howard Avenue, Milwaukee,

Wisconsin.  While traveling to the transaction location, CI 28830 and AFZAL communicated via

a Snapchat phone call to confirm they (CI and SA Ramos) were on the way.  Once at the above

location, agents observed AFZAL in a white, Honda Accord bearing Wisconsin license plate

AHJ6759 with an unknown male passenger.  SA Ramos and CI 28830 parked next to AFZAL.

AFZAL entered SA Ramos' undercover vehicle to complete the sale.  Inside the vehicle, AFZAL

presented a gun box containing the below items in exchange for $1,700 (ATF funds):

- a Walther, model PPQ, .22 caliber pistol bearing serial number PP015502, three
  (3) magazines

- (13) rounds of .22 caliber ammunition

- Suspected silencer (not yet test fired)



(Above mentioned Walther pistol)



(Above mentioned silencer)

23.    ATF agents know that each deal between the CIs and AFZAL have been initiated

utilizing cellular phones.  Affiant knows this because AFZAL communicates between a series of

text messages and phone calls.  Further, AFZAL makes calls from places outside of his residence

(such as the Nissan dealership).  Affiant knows that this indicates that AFZAL keeps his cellular

device on his person. In addition, the CIs have observed AFZAL manipulating his cellular phone during the aforementioned deals. This also means that AFZAL has the ability to utilize Snapchat to further this scheme when in possession of a cellular device.

24. Agents confirmed that the subscriber name and address for the cell phone associated with AFZAL (414-539-8733), is listed to Noman AFZAL of 4383 South 13th Street, Milwaukee, Wisconsin with a service provider of AT&T.

25. Throughout this case, AFZAL has used Snapchat to communicate with ATF CIs and facilitate the scheme to traffic silencers and firearms. The CIs advised that AFZAL did not send pictures of firearms or silencers via traditional text messaging services. All photos of firearms and silencers for sale sent by AFZAL were always transmitted via Snapchat. The following are screenshots taken by CI 28830 of firearms and silencers (not previously noted above) that were sent to by AFZAL from Snapchat account "A-Naman" to the CI as part of the scheme to illegally traffic firearms:



(Sent via to CI 28830 via AFZAL's Snapchat account on June 16, 2020)



(Sent via to CI 28830 via AFZAL's Snapchat account on July 5, 2020)



(Sent via to CI 28830 via AFZAL's Snapchat account on July 16, 2020)

26.     Affiant believes the Snapchat account **"A-Naman"** holds valuable evidence of

violations of 18 U.S.C § 922(a)(1)(A) (engaging in a firearms business without a license), 26

U.S.C. § 5861(b) (Receipt or Possession of Firearm Transferred in Violation of the NFA), 26

U.S.C. § 5861(d) (Possession of Unregistered NFA),  26 U.S.C. § 5861(e) (Transferring Firearm

in Violation of NFA),  26 U.S.C. § 5861(f) (Making Firearm in Violation of NFA), 26 U.S.C. §

5861(i) (Possession of NFA without a Serial Number), and 18 U.S.C. § 371 (conspiracy).

Further, Affiant believes this information presently exists since a preservation order was served on Snapchat, Inc. on July 01, 2020, for existing information and the preservation of future information. Snap, Inc. confirmed the receipt of this preservation order and their compliance. Information on this account could be used as evidence for violations of the above statutes in addition to assisting agents in locating other buyers and manufacturers of illegal firearms.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

27.     Snap, Inc. (Snapchat) is the provider of the internet-based account identified by **"A-Naman".**

28.     Snap, Inc. (Snapchat) owns and operates a free access social networking website that can be accessed at http://www.snapchat.com. Snapchat is a cellphone application with which users can take photos, record short videos, add text and drawings to such photos or video, and send these contents to a selected list of recipients. Photos and videos sent over the application are known as "snaps." Snap, Inc. (Snapchat) also enables users to communicate by text in a way similar to an instant-messaging application via chat and video chat features. Snapchat is one of the most popular applications for sending and receiving "self-destructing" messages, pictures, and videos.

29.     Users can set a time limit on their snaps that affect how long they may be viewed by the receiver of the snap. At the end of the viewing time, the snap disappears and the receiving party can no longer view it without use of the Replay feature. The Replay feature allows a user, once a day, to re-watch a snap he received, even though the time limit on the snap may expire. Users may use the Replay feature on one snap per day only.

30.     Snapchat users can send text messages to others using the Chat feature. Once a user leaves the Chat screen, messages viewed by both the sender and the receiver will no longer

be visible.  However, Snapchat does allow users to "save" specific messages, enabling portions of the conversation to be retained.

31.  "Our Stories" is a collection of user submitted "Snaps" from different locations and events.   A Snapchat user, with the location services of their device turned on, can contribute to a collection of snaps regarding the event.  For example, multiple Snapchat users at an event could each contribute to the same "Our Stories" collection by sharing their snaps, even if they do not know each other.  Users can also view "Our Stories" events, even if they are not actually present at the event by subscribing to the story.  In addition to "Our Stories," a Snapchat user can keep a photo/video diary using the "Story" feature.  Each snap in a "Story" documents the user's experience.  Based on the user's privacy settings, the photos and videos added to a "Story" can be viewed either by everyone on Snapchat or by the user's friends only.   Stories are visible to other users for up to twenty-four hours.

32.  Snapchat "Our Stories" are collections of Snaps submitted from different users throughout the community.  "Our Stories" connected to a specific location may be selected to appear on "Snap Map."  "Snap Map" aggregates stories based on geolocation.  It also allows users to share their locations with friends.  If a user is sharing their location on "Snap Map," it is updated every time the Snapchat app is opened.  A user's specific location will be visible on "Snap Map" for several hours before it is deleted.  General location information may be retained longer, but it is subject to regular deletion.

33.  Snapchat also allows users to save sent or unsent "snaps" and posted "Stories," photos, and videos to "Memories," which is Snapchat's cloud-storage service.  A user can also edit and send Snaps as well as create "Stories" from the saved "Memories."  The "Memories" will be saved by Snapchat until deleted by the user.

34.     Snapchat also provides users with the ability to video chat with each other via the application.

35.     Snapchat users may create a list of Friends by which they can identify other Snapchat users for the purposes of sending and receiving information.  Users may search for and add Friends by a number of methods, including username, the user's cellphone address book and other methods allowed by the application.

36.     While a Snapchat communication may disappear, the record of who sent it and when still exists.  Snap, Inc. (Snapchat) records and retains information that is roughly analogous to the call detail records maintained by telecommunications companies.  This includes the date, time, sender, and recipient of a snap.  Additionally, PROVIDER stores the number of messages exchanged, information concerning which users most communicated with a specific account, and a particular message's status, including if and when the message was opened and whether the receiver used the native screen capture function of his device to take a picture of the snap before it disappeared (screenshot notifications).

37.     Snap, Inc. (Snapchat) asks users to provide basic contact and personal identifying information to include date of birth.  When a user creates an account they make a unique Snapchat username.  This is the name visible to other Snapchat users. An e-mail address is required to register a Snapchat account and a new user must also provide a mobile phone number.  This phone number is verified during the registration process.  Snapchat sends an activation code which must be entered before proceeding with the registration step.  However, a user may elect to bypass entering a phone number, so a phone number may not always be present in the user's account.  Snap, Inc. (Snapchat) also retains the account creation date, the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with

particular log-ins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

38.    Snap, Inc. (Snapchat) stores device information such as the model, operating system, operating system version, mobile device phone number, and mobile network information of devices used in conjunction with the service. They also collect unique device identifiers such as the Media Access Control (MAC) address and the International Mobile Equipment Identifier (IMEI) or Mobile Equipment Identifier (MEID) of devices used to access Snapchat. In the event the Snapchat user's application crashes, the company also collects a list of other installed applications on the device to detect any potential software conflicts.

39.    In my training and experience, in some cases, account users will communicate directly with an online service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

40.     As explained herein, information stored in connection with a Snapchat account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating officials to establish and prove each offense-element, or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, I know that the information stored in connection with a Snapchat account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, sent and received snaps (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the online service provider can show how and when the account was accessed or used.  For example, providers typically log the IP addresses from which users access the account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the criminal activity under investigation.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video uploaded).  Finally, stored electronic data may provide relevant insight into the account owner's state of mind as it relates to the offense under investigation.  For example, information in an account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## <u>CONCLUSION</u>

41.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Snap, Inc. (Snapchat) who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information that is associated with the Snapchat account

identified by **"A-Naman"** and is stored at premises owned, maintained, controlled, or operated by

Snap Inc., a company that accepts service of legal process at 63 Market Street, Venice,

California.

## ATTACHMENT B

### Particular Things to be Seized and Procedures
### to Facilitate Execution of the Warrant

**I.      Information to be disclosed by Snap Inc. ("PROVIDER") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of Snap, Inc., regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or other information that have been deleted but are still available to Snapchat, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Snapchat is required to disclose the following information to the government for each account or identifier listed in Attachment A (the "Account"):

   a.   For the time period June 02, 2020 to present: The contents of any available messages or other communication associated with the Account (including, but not limited to snaps, screenshot notifications, chats, videos, Stories, Memories, attachments, draft messages, posts, "friend" requests, recordings, images, or communications of any kind sent to and from the Account, including stored or preserved copies thereof), and related transactional records for all Snapchat services used by an Account user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each communication, the date and time at which each message or other communication was sent, and the size and length of each message or other communication;

b.   For the time period from June 02, 2020 to present:  All photos and videos uploaded by the Account, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

c.   Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all users that logged into Snapchat by the same machine as the Account);

d.   For the time period June 02, 2020 to present:  All records or other information related to the Account, including address books, contact and "friend" lists; profile information; subscriptions, location settings, and privacy settings;

e.   For the time period from June 02, 2020 to present:  All records pertaining to communications between Snap, Inc. (Snapchat) and any person regarding the Account, including contacts with support services and records of actions taken;

f.   All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile

Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic

Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access

Control ("MAC") addresses, operating system information, browser information,

mobile network information, information regarding cookies and similar technologies,

and any other unique identifiers that would assist in identifying any such device(s);

and

g. Information about any complaint, alert, or other indication of malware, fraud, or

terms of service violation related to the Account or associated user(s), including any

memoranda, correspondence, investigation files, or records of meetings or discussions

about the Account or associated user(s) (but not including confidential

communications with legal counsel).

Within 14 days of the service of this warrant, Snap, Inc. shall deliver the information set

forth above via United States mail or courier to: Special Agent Ryan Arnold, Bureau of Alcohol,

Tobacco, Firearms and Explosives (ATF) located at 1000 N. Water Street, Suite 1400,

Milwaukee, WI, 53202 or via e-mail to ryan.arnold@atf.gov (preferred method).

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 U.S.C § 922(a)(1)(A) (engaging in a firearms business without a license), 26 U.S.C. § 5861(b) (Receipt or Possession of Firearm Transferred in Violation of the NFA), 26 U.S.C. § 5861(d) (Possession of Unregistered NFA),  26 U.S.C. § 5861(e) (Transferring Firearm in Violation of NFA),  26 U.S.C. § 5861(f) (Making Firearm in Violation of NFA), 26 U.S.C. § 5861(i) (Possession of NFA without a Serial Number), and 18 U.S.C. § 371 (conspiracy). including, for each Account, information pertaining to the following matters:

(a)  Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b)  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c)  Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d)  Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning the criminal conduct described in the affidavit related to violations of 18 U.S.C § 922(a)(1)(A) (engaging in a firearms business without a license), 26 U.S.C. § 5861(b) (Receipt or Possession of Firearm Transferred in Violation of the NFA), 26 U.S.C. § 5861(d) (Possession of Unregistered NFA), 26 U.S.C. § 5861(e) (Transferring Firearm in Violation of NFA), 26 U.S.C. § 5861(f) (Making Firearm in Violation of NFA), 26 U.S.C. § 5861(i) (Possession of NFA without a Serial Number), and 18 U.S.C. § 371 (conspiracy).